UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

BEST WOOD JUDGE FIREWOOD
AND TREE SERVICE,

          Plaintiff,

      v.                          Case No. 09-C-0524

UNITED STATES DEPARTMENT
OF TRANSPORTATION,
UNITED STATES DEPARTMENT OF
TRANSPORTATION DEPARTMENTAL
OFFICE OF CIVIL RIGHTS,
JOSEPH AUSTIN,

          Defendants.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. #26), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #32) AND DISMISSING CASE

Best Wood Judge Firewood and Tree Service ("Best Wood Judge"), a sole proprietorship of Thomas Holzrichter, filed this case against a federal agency, one of its departments, and the department's associate director, requesting declaratory and injunctive relief. Best Wood Judge seeks review of a determination that it is ineligible for a federally-funded Disadvantaged Business Enterprise program. Best Wood Judge's complaint asserts (1) a claim for reversal under the Administrative Procedure Act, 5 U.S.C. § 706; and (2) a violation of its right to equal protection.

Best Wood Judge has moved for summary judgment on count one. On the other hand, defendants have moved for summary judgment and dismissal of both counts. As discussed below, the defendants' motion will be granted, the plaintiff's motion will be denied and this case will be dismissed.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, establishing a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support an essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

Because the parties in this case have filed cross-motions for summary judgment, many facts are not contested. Nevertheless, both sides are required to show that no genuine issues of material fact exist, taking the facts in the light most favorable to

the party opposing each motion. That both parties have moved for summary judgment, and contend that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower the court to enter judgment as it sees fit. See 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 at 327-28 (3d ed. 1998). In other words, cross-motions for summary judgment do not constitute a waiver of trial. See *Miller v. LeSea Broad., Inc.,* 87 F.3d 224, 230 (7th Cir. 1996).

## UNDISPUTED FACTS

Thomas Holzrichter, a Caucasian male, is sole proprietor of Best Wood Judge, which was established on September 1, 1980. (Pl.'s Proposed Findings of Fact in Supp. of Pl.'s Mot. for Summ. J. ("PPFOF") ¶ 2[1] - 3; Administrative Record ("AR") at 110-13[2]; Pl.'s Aff. ¶ 2.) Best Wood Judge's "primary business activities are land clearing for construction, tree trimming, and removals for residential, commercial, government, and firewood and mulch sales." (PPFOF ¶ 5; Pl.'s Aff. ¶ 2.) Besides Holzrichter, Best Wood Judge employs two full-time tree trimmers, one part-time tree trimmer, one full-time and one part-time office management positions, one full-time mechanic, and ten part-time seasonal laborers. (Defs.' Combined Br. in Supp. of Mot. for Summ. J & Resp., § III (Defs.' Proposed Findings of Material Fact) ("DPFMF") ¶ 9; AR at 119.)

Local 139 of the International Union of Operating Engineers ("IUOE") represents heavy equipment operators and other employees throughout Wisconsin.

---

[1]Unless otherwise noted, a cited proposed finding of fact was accepted by the opposing party.

[2]The Administrative Record is found in two parts: selected pages were filed as Document 22 in the docket (a submission for in camera review of protected documents) and the remaining pages were filed as Exhibit A to Document 31 (the affidavit of Brent Nistler). The pages of the Administrative Record are numbered with a Bates-type stamp in the bottom right-hand corner.

(DPFMF ¶ 13; AR at 149-50.)  Holzrichter is not a member of Local 139 and Best Wood Judge has not signed a contract with the IUOE or Local 139.  (DPFMF ¶ 14; Nistler Aff., Ex. C at 29; *see* Compl. ¶¶ 2, 3.)  Holzrichter[3] acts as a subcontractor, and Local 139, in its "Heavy and Highway Construction Agreement," prohibits the use of non-union subcontractors by its union contractors.  (PPFOF ¶¶ 14, 25; Nistler Aff. Ex. B, Ex. 1 at unnumbered 1; AR at 149-50.)

On January 22, 2007, Holzrichter submitted to the Wisconsin Unified Certification Program ("WisDOT"[4]) an application by Best Wood Judge for a Disadvantaged Business Enterprise ("DBE") certification.  (PPFOF ¶ 4; Defs.' Resp. & Obj'ns to Pl.'s Proposed Findings of Material Facts ("Defs.' Resp.") ¶ 4; DPFMF ¶ 1; AR at 108, 110; Pl.'s Aff. ¶ 3.)

By affidavit dated January 31, 2007, Holzrichter described instances when his business was not retained by contractors for projects as a result of not having employees who were members of a labor union.  He became aware of the alleged discrimination in 1988 and instances of discrimination against him increased thereafter; he began to document alleged instances of discrimination in 2004; and from October 2004 to

---

[3]Although the plaintiff in this case is Best Wood Judge and Best Wood Judge was the applicant for DBE status, many of the proposed findings of the parties treat Holzrichter as the plaintiff or applicant.  Defendants note this in some of their objections to Best Wood Judge's proposed findings, yet they too, slip into referring to Holzrichter as the plaintiff or applicant.  (*See, e.g.*, DPFMF ¶¶ 55, 56, 63.)  The court has tried to refer to Best Wood Judge as the plaintiff or applicant, but at times has accepted the proposed findings of fact as submitted, even if they refer to Holzrichter.

[4]The Wisconsin Unified Certification Program appears to be a joint program of the Wisconsin Department of Transportation, Milwaukee County, Dane County, and the City of Madison.  A certified DBE of the Wisconsin Unified Certification Program would be eligible to bid as a DBE on U.S. Department of Transportation projects led by any of the four agencies.  (*See* AR at 61.)  Because Best Wood Judge appears most concerned with projects of the Wisconsin Department of Transportation, and because of the parties' use of terminology in this case, the court will refer to the certification program as "WisDOT."

January of 2007, contractors did not award "clearing and grubbing work" contracts to him because he was a non-union subcontractor. (DPFMF ¶ 3; AR at 155-57.) In 2006, Best Wood Judge or Holzrichter was the low bidder on projects for Payne and Dolan, RJ Huston, Musson Brothers, and Highway Landscaper, but because Best Wood Judge was not a union contractor or Holzrichter was not a member of a union, Best Wood Judge was not awarded the work. (PPFOF ¶ 9; Defs.' Resp. ¶ 9; AR at 149; Holzrichter Aff. ¶ 9.) Other contractors would not entertain a bid from Best Wood Judge because it was not a member of the union. (PPFOF ¶ 11[5]; Pl.'s Aff. ¶ 9.) At times parking lot work for which Best Wood Judge had contracted was terminated because the hiring company was not allowed to subcontract to non-union firms. (PPFOF ¶ 12; Defs.' Resp. ¶ 12; Nistler Aff. Ex. B, Ex. 1 at unnumbered 16.)

Holzrichter's situation in losing WisDOT work has been "substantial and chronic." (PPFOF ¶ 13.) Best Wood Judge's non-union status has made it ineligible to do 94% of potential southeastern Wisconsin WisDOT work. (PPFOF ¶ 15; Defs.' Resp. ¶ 15; AR at 136.) And the business manager of Local 139 has boasted that Local 139's members control over 90% of WisDOT work. (PPFOF ¶ 16; *see* Nistler Aff. Ex. B, Ex. 1 at 25.)

Holzrichter submitted letters to WisDOT describing why his personal religious belief system absolutely prohibits him from joining a union. (PPFOF ¶ 17; Pl.'s Aff. ¶¶ 5-6.) He does not morally or ethically agree with tactics and philosophies of a union that uses coercion, corruption and illegal activity, discrimination and threats, including a threat to him

---

[5]It is unclear to the court whether Best Wood Judge could be a union member, but the court will take this statement to mean either a union member or a signatory to a union contract.

from the IUOE or Local 139 that he "won't be working on this job or any other job until you join the Union."  (PPFOF ¶ 18; AR at 146-47.)

WisDOT conducted an on-site review of  Holzrichter's business on April 11, 2007, related to its DBE application.  (DPFMF ¶ 4.)  During the on-site review, Holzrichter told WisDOT that he was seeking DBE certification as a way to obtain more work for Best Wood Judge because its non-union status was a disadvantage.  (DPFMF ¶ 5; AR at 117.)  Holzrichter explained that he was seeking DBE status to level the playing field, counteracting contractors who discriminate against non-union subcontractors like him.  (PPFOF ¶ 7; DPFMF ¶ 5; AR at 116-17.)

On or about April 12, 2007, Best Wood Judge provided WisDOT with a profit and loss statement as well as a balance sheet and loan information.  (DPFMF ¶¶ 6, 7; AR at 118, 159-62.)  By e-mail dated May 9, 2007, Holzrichter told WisDOT that a contractor told him it would not retain Best Wood Judge for a project because "the Union" harassed it about its plan to use a non-unionized company.  Holzrichter asserted in the e-mail that non-union discrimination against his company for clearing and grubbing work was continuing and escalating because in addition to large projects, he was not receiving contracts for small projects.  (DPFMF ¶ 12.[6])

By letter dated May 14, 2007, the business manager of Local 139  advised Best Wood Judge that Local 139's master collective bargaining agreement required "that signatory contractors only subcontract construction work to companies who are signed to the applicable Local 139 collective bargaining agreement."  (AR at 149; PPFOF ¶ 25; Defs.'

---

[6]Defendants cite to AR at 163 for this proposed finding.  The court has been unable to find page 163 in Exhibit A to Nistler's Affidavit or Document 22.  However, because Best Wood Judge has not opposed the proposed finding, the court accepts the statement as true.

Resp. ¶ 25; DPFMF ¶ 14.) The letter stated that Local 139 intended to notify its signatory contractors that they may not subcontract construction work to Best Wood Judge. (PPFOF ¶ 26; DPFMF ¶ 14; AR at 149.) Moreover, the letter noted that because Best Wood Judge had not signed the collective bargaining agreement with Local 139, it was losing valuable business opportunities. (PPFOF ¶ 27; Defs.' Resp. ¶ 27; DPFMF ¶ 14; AR at149.) The business manager closed by stating that if Best Wood Judge wanted to learn more "about the value of being a Local 139 signatory contractor," it was invited to contact the branch office. (DPFMF ¶ 14; AR at 150.)

Best Wood Judge forwarded Local 139's letter to WisDOT on May 23, 2007, and asserted that it evidenced his company's inability to work on approximately 94% of WisDOT projects in Wisconsin. (DPFMF ¶ 15; AR at 148.) Moreover, Holzrichter provided to WisDOT a statistical analysis of information from a public record request concluding that 94% of WisDOT dollars go to companies affiliated with unions. (PPFOF ¶ 28; AR at 135-42.)

By letter dated June 5, 2007, Holzrichter responded to a question posed by a representative of WisDOT: "Isn't joining the Union your choice?" He answered stating that he could not join a union because of economic, moral and ethical considerations. (DPFMF ¶ 27; AR at 146.) Holzrichter added:

> As a child, I was brought up by my parents, teachers, and religion to know the difference between right and wrong; to know that it is important to care about and be considerate to others; that decisions must be made for the right reasons; that you are who you associate with; that many times the correct decision is not the easy one; and that it is no good to gain the whole world and lose your soul in the process.

As an adult, I cannot justify, for any reason, associating with and being part of a group that:

- Attempts to coerce me and other contractors to join their group;
- Communicates to its members not to hire my company because we can't morally and economically join;
- Discriminates even against its own members;
- Threatens its own members on a regular basis;
- Embezzles its members['] funds for personal and political use;
- Has been arrested and convicted of fraud, corruption, embezzlement, racketeering, vandalism, assault, bribery and taking bribes, witness tampering, and loan sharking;
- Refuses to release money that members contributed to the union benefit funds when they decide to leave the union;
- Sues and fines its former members for quitting the Union;
- Told me, on State Hwy 164 job, that "you won't be working this job or any other job unless you join the Union";
- Tells its members that if they make life miserable enough for my company and keep my company from working that eventually we'll cave in and join;
- Intentionally sends numbers of "gorillas" to offices and job sites of non-union AND union contractors alike to threaten and harass them to do what they want;
- Tells a non-union company who they are harassing, "Your bleeding will end when you join."
- Puts letters in mailboxes saying, "We know where you live, where your wife works and kids go to school."

Mr. Franklin, my upbringing and religion leave me no choice in this matter. I feel that joining the Union would be tantamount to "selling my soul to the devil."

(DPFMF ¶ 28; AR at 146-47.)

The letter cited alleged economic circumstances that prevented Holzrichter or Best Wood Judge from joining a union:

The financial aspect of joining the union would be devastating to my company. While we have a good base of private construction clients, we do not have enough clients to do construction work on a full time basis. . . . [I]f I joined the union, I would need to pay union wages for 100% of the hours worked, not just the required higher wages on the public works projects (which we are already pay[ing]), but also on every hour that any employee would work, including residential tree work, floor sweeping, firewood delivery, etc. Since we would have to charge our customers more because of the higher labor cost, we would effectively price ourselves out of the market rendering us uncompetitive in markets which we were competitive in before and be at risk of losing our business.

(DPFMF ¶ 29; AR at 147.)

On June 26, 2007, WisDOT advised Best Wood Judge that it planned to deny certification as a DBE on two separate grounds. (PPFOF ¶ 31; DPFMF ¶ 30; AR at 106-07.) First, the non-union status of Best Wood Judge was not "a personal or individual characteristic of the applicant," that there was a distinction between Holzrichter and Best Wood Judge as they were not "one in [sic] the same," and the status of the company could not be attributed to its owner. (AR at 106.) Second, "the company's non-union status is a choice by the applicant; it is a decision the applicant made. The applicant can indeed become a member of the union if he so desired. The applicant's decision to not have his company join the union is not 'circumstances beyond their control' as stated in [the applicable regulation.]" (AR at 107.)

WisDOT allowed Best Wood Judge to respond to the proposed denial within twenty-one days; otherwise the denial would take effect on July 19, 2007. (DPFMF ¶ 31; AR at 106-07.) Holzrichter responded on August 8, 2007. (PPFOF ¶ 33; DPFMF ¶ 32; AR at 143-45.) He asserted that because he operated Best Wood Judge as a sole proprietorship, he and that business were "one in the same," that his decision not to

unionize was "based upon [his] personal beliefs," and that the "circumstances beyond [an applicant's] control" component of the DBE regulations was unrelated to a choice made by an applicant, but rather, referred to an applicant's "inability to address or rectify the racial or ethical prejudice or cultural bias within American society causing members of their group to be socially disadvantaged." (DPFMF ¶ 32; AR at 143-45.)

By letter dated February 14, 2008, with attachments, Holzrichter again responded to the proposed denial of his application for certification as a DBE, again asserting that there was no distinction between his business and individual status and that as the sole proprietor of his business, he made all important decisions for the company. (DPFMF ¶ 33; AR at 125-42.) Holzrichter set forth what he described as eight "proofs" for his belief that his decision not to unionize subjected his business to social or cultural bias, and that those eight reasons also showed that his decision not to unionize was a circumstance beyond his control. (DPFMF ¶ 35; AR at 126-33.) With respect to his fourth proof, "Join the Union or Quit," Holzrichter advised that he was informed by WisDOT that he had three choices: (1) "Do the 6% of the work I am 'eligible' to do;" (2) "Join the Union," or (3) "quit working." (DPFMF ¶ 39; AR at 128.) He said he found those alleged statements "to be alarming." (DPFMF ¶ 40; AR at 128.) With respect to his seventh proof, Holzrichter asserted that classifying his decision not to unionize as involving a matter of choice would be analogous to assuming that minorities possess the choice to relocate to another area of the country for better employment opportunities and/or selling their businesses to non-minorities, or requiring a woman to have a sex change operation. (DPFMF ¶ 47; AR at 131.)

WisDOT held an informal hearing on Best Wood Judge's application on May 29, 2008. (*See* Nistler Aff. Ex. D at 1; Pl.'s Proposed Suppl Facts ¶ 8.) The hearing focused on the social disadvantage element of the pertinent test because the economic disadvantage element "ha[d] already been looked at." (DPFMF ¶ 16; Nistler Aff. Ex. C at 12.) One of the hearing officers stated that "economic disadvantage was not the discussion point today—that's pretty much a given." (Nistler Aff. Ex. C at 72.)

Holzrichter testified at the WisDOT hearing regarding his "his deeply and sincerely held religious beliefs which prevent [him] from joining a union." (Pl.'s Aff. ¶ 7; *see* PPFOF ¶ 19.) In addition, he showed WisDOT representatives an article describing Local 139's use of giant inflatable rats at a demonstration to harass management. (PPFOF ¶ 20; Nistler Aff. Ex. B, Ex. 2 at 1 (Doc. 31-2 at 35).) Holzrichter presented a historical document called "Historical Catechism of American Unionism," published by the Industrial Workers of the World, Chicago, Illinois, to stress that he sees the union philosophy as a separate set of religious beliefs contradictory to his own. (PPFOF ¶ 21; DPFMF ¶ 22; Nistler Aff. Ex. B, Ex. 2 at 14-80 (Doc. 31-2 at 48 to 31-3 at 13), Ex. C at 69-71.) Holzrichter stated that the union's philosophy is that the employer is the enemy, whereas he believes the employer and employee should work together. (DPFMF ¶ 22; Nistler Aff. Ex. C at 58, 66.)

In response to inquiry during the hearing on whether his refusal to join a union was based on religious views, Holzrichter stated that his decision was based on moral and ethical beliefs. (DPFMF ¶ 17; Nistler Aff. Ex. C at 31-32.) Later in the hearing, he added that the religion that he practices, Catholicism, does not prohibit union participation, but that his motivation not to unionize derived from his deeply-rooted religious beliefs. (DPFMF ¶ 18; Nistler Aff. Ex. C at 39.)

> You know, it's—it's not a question of—of whether or not I can join, you know. I can join. All right? You know, I'm a practicing Roman Catholic, you know. That's not in the Roman Catholic catechism that you cannot be union, but the way I was brought up, the way I was taught, you know, comes—my motivation comes from my religious belief. You know they're deeply-rooted beliefs. You know, I grew up that way. I went to Catholic grade school, I went to a Catholic high school. I've tried to live my life—sometimes unsuccessfully—but, you know, going in the right direction. You know, who I am and this is the way I am and what I believe in. You know, I believe that, you know, that all people should be treated with respect. All right?

> The union doesn't do this, all right?

(DPFMF ¶ 19; Nistler Aff. Ex. C at 38-39.)  He testified that the union is a negative group; that the union does not give employees incentive to work faster; that union heads have been charged with corruption, extortion, and racketeering; and that members engage in intimidating behavior.  (DPFMF ¶ 20; Nistler Aff. Ex. C at 43-46.)  Holzrichter objected to how unions organize and feels that they recruit members by using a "mob group mentality." (DPFMF ¶ 21; Nistler Aff. Ex. C at 47.)

However, Holzrichter advised that the teachers' union was "great" and that government employee unions are "good union[s]." He indicated that such unions are "good because when you have a large number of people . . . you can't have a lot of subjectivity." (DPFMF ¶ 23; Nistler Aff. Ex. C at 42, 43-44.)  Moreover, Holzrichter testified that his wife had been a member of a teachers' union.  (*Id.*)

Holzrichter's disagreement with the "union" is specific to the construction industry and Local 139 or IUOE.  (Nistler Aff. Ex. C at 42-44.)  He said there is a cultural bias against non-unions in construction contracting, and that the cultural bias against non-union companies is comparable to race discrimination.  (DPFMF ¶ 24; Nistler Aff. Ex. C at

12

53, 65.)  Holzrichter further stated:  "'You can eat, but just not at this lunch counter,' all right?  'You can ride by the bus, just not in the front,' or 'You can work, but not these projects'?  What's the difference?"  (DPFMF ¶ 24; Nistler Aff. Ex. C at 53.)

When Holzrichter started the company he did a lot of residential work and some small WisDOT projects—"because the bigger companies just didn't want to do them, so they kind of left you alone."  As the company grew he took out loans for large equipment.  "So I started taking out loans, getting larger equipment, started doing a few bigger projects, and almost immediately, I started getting—really getting harassed by the unions."  (DPFMF ¶ 26; Nistler Aff. Ex. C at 18-19.)

Holzrichter was not asked whether he or any of his employees is a member of the Seventh-day Adventist Church.  (DPFMF ¶ 25; Pl.'s Resp. & Obj'n to Defs.' Proposed Findings of Material Fact ¶ 25; *see, e.g.*, Nistler Aff. Ex. C at 39.)

WisDOT issued its final decision to deny Best Wood Judge DBE status on July 3, 2008.  (PPFOF ¶ 35; DPFMF ¶ 51; AR at 101-05.)  It based its decision the two grounds it had proposed earlier:

> Firstly, the [Informal Hearing Committee] IHC finds that the non-union status of Best Wood Judge is not a *personal* or *individual characteristic* of Mr. Holzrichter.  The IHC finds there is a clear distinction between Mr. Holzrichter and Best Wood Judge and that the two are not one in the same.  The IHC finds that the non-union status of Best Wood Judge cannot be attributed to Mr. Holzrichter *the person* or held to be a social or cultural characteristic of Mr. Holzrichter.  The IHC finds that for the purposes of Appendix E the two entities are distinct and separate.
>
> Secondly, the IHC finds that the company's non-union status is a choice by Mr. Holzrichter, a decision that Mr. Holzrichter made.  The IHC finds that there is nothing precluding Mr. Holzrichter's company from becoming a

> signatory to the union if he so desired. In fact, by his own
> admission at the hearing, the union has repeatedly invited him
> to become a signatory to them and he refuses. Clearly, the
> union has not forbidden Mr. Holzrichter from having his firm
> become a signatory to the union. The IHC found that Mr.
> Holzrichter's decision to have the company not join the union
> is not "circumstances beyond their control" as stated in
> Appendix E.

(DPFMF ¶ 54; AR at 102.)

The decision did not question the sincerity or intensity of Holzrichter's beliefs or Holzrichter's assertion that he is economically disadvantaged. (PPFOF ¶¶ 39, 40; AR at 101-05.)

Holzrichter d/b/a Best Wood Judge appealed the denial of DBE certification of Best Wood Judge to the United States Department of Transportation, Office of Civil Rights Review ("USDOT"). (PPFOF ¶¶ 41, 43; DPFMF ¶ 55; Defs.' Resp. ¶¶ 41, 43; AR at 15.) In doing so, it was argued that Holzrichter and his business were not separate or distinct entities because Holzrichter operated the business as a sole proprietorship; Holzrichter's non-union position is premised upon his moral and personal religious beliefs; WisDOT was treating persecution based on religious beliefs differently than racial or ethnic bias; and that WisDOT erred in finding that Best Wood Judge's non-union status was a choice of Holzrichter. (DPFMF ¶¶ 57, 62, 63; AR at 19-25.) A number of documents were attached to the appeal letter, including material that WisDOT did not possess. (PPFOF ¶ 44; DPFMF ¶ 80; *see* AR at 15-100; Nistler Aff. Ex. B ("Suppl. Record" or "SR") at 27-100.)

Holzrichter referenced a DBE certification that WisDOT granted to a landscape enterprise operated as a sole proprietorship by David Nietzer, an amputee who could not afford a prosthesis. (DPFMF ¶¶ 64, 65; AR at 21-22, 57-70.) WisDOT had

14

asked Nietzer to provide additional information about how his amputation affected his ability to work and he responded with a notation that he was unable to work outside of his business. (DPFMF ¶ 65; AR at 59-60.) Holzrichter asserted that Nietzer's response did not include "the type of factual support [he] diligently provided" to WisDOT. (DPFMF ¶ 66; AR at 21.) Holzrichter submitted that WisDOT was not using uniform standards in determining whether to grant DBE certifications, and that after he "demonstrated how his personal religious beliefs negatively impacted his ability to make a living and/or operate his business (the answer to the very same question the WUCP asked David Nietzer), his application should have been granted just like the WUCP granted Mr. Nietzer's application." (DPFMF ¶ 68; AR at 21-22.)

Holzrichter offered that WisDOT was requiring him "to ignore his deep seated personal beliefs, and join what he believes to be an immoral and unethical union whose practices violate just about every tenant [sic] of his belief system. This is not even a remotely viable option." (DPFMF ¶¶ 70, 71; AR at 22.) Holzrichter charged that the First Amendment prevents any governmental body from compelling a person to modify his personal religious beliefs. (DPFMF ¶ 74; AR at 23-24.) He pointed to cases that have recognized the opposition the Seventh-day Adventist faith has to union membership and required employers and unions to reasonably accommodate those beliefs so that members of that faith are not forced to choose between joining a union or losing their employment. (DPFMF ¶ AR 25.)

On January 28, 2009, the USDOT informed Best Wood Judge's attorney that the appeal was denied. (PPFOF ¶ 46; Defs.' Resp. ¶ 46; AR at 1.) USDOT advised that it had reviewed the record from WisDOT and Holzrichter's additional information and

concluded that the denial was supported by "substantial record evidence" and that Holzrichter had not met the burden of demonstrating that he is a socially and economically disadvantaged individual as defined by applicable regulations. (DPFMF ¶ 81; AR at 1.)

With respect to its finding regarding lack of social disadvantage, the USDOT provided three grounds, discussed in more detail below. (PPFOF ¶ 48; Defs.' Resp. ¶ 48; AR at 1-12.) In addition, USDOT concluded that Holzrichter was not economically disadvantaged. (PPFOF ¶ 53; Defs.' Resp. ¶ 53; AR at 1-12.) In conclusion, the USDOT found that "the information provided cumulatively supports WISDOT's determination that Best Wood Judge does not meet the criteria as required for DBE certification." (DPFMF ¶ 93; AR at 8-9.)

The USDOT's decision did not question the sincerity of Holzrichter's beliefs. (PPFOF ¶ 57; AR at 1-12.) Nor did the decision question that Best Wood Judge had lost the vast majority of WisDOT contracts because it or Holzrichter was not a member of the local union and that the union discriminated against non-union subcontractors. (PPFOF ¶ 58; AR at 1-12.)

After filing this lawsuit and receiving the administrative record, Best Wood Judge asserted that certain information that had been provided to WisDOT was not part of the record and asked USDOT to review those documents. (DPFMF ¶ 94; *see* Nistler Aff. Ex. D.) Hundreds of pages of information that Holzrichter provided to WisDOT in support of the DBE application, as well as a recording or transcript of the hearing before WisDOT on May 29, 2008, had not been included in the administrative record. (PPFOF ¶ 42; Defs.' Resp. ¶ 42; Nistler Aff. ¶ 3, Ex. B; *see* Nistler Aff. Ex. D.)

On April 29, 2010, USDOT wrote Best Wood Judge, stating that "[a]fter carefully reviewing" the additional material, "the Department's position remains unchanged; Mr. Holzrichter is not socially and economically disadvantaged within the meaning of Appendix E of the Regulation. We affirm our January 28, 2009, decision." (DPFMF ¶ 95; Nistler Aff. Ex. D.)

ADMINISTRATIVE PROCEDURE ACT CLAIM

A.    Standard of Review

The Administrative Procedure Act, 5 U.S.C. § 702, permits judicial review of agency action when sought by a person adversely affected. The reviewing court determines relevant questions of law, interprets constitutional and statutory provisions, and reviews the administrative record. 5 U.S.C. § 706. An agency's action may be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). The agency's findings of fact must be upheld if supported by substantial evidence. § 706(2)(E).

The "arbitrary and capricious" standard of review is narrow, and a court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, the agency must have examined the relevant data and articulated a satisfactory explanation for its action, showing a rational connection between the facts and its decision, and the decision must have been based on consideration of the relevant factors. *Id.* In applying this standard, the court may not supply a basis for the agency's action that the agency did not give, though a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (internal quotation marks omitted). Further, this court may not set aside

17

the agency's decision or inference merely because it finds the opposite conclusion more reasonable. *Roadway Express, Inc. v. U.S. Dep't of Labor*, 612 F.3d 660, 664 (7th Cir. 2010).

B.    DBE Regulations

DBE status is governed by regulations in 49 C.F.R. pt. 26. Through part 26 the USDOT seeks to, among other things, "ensure nondiscrimination in the award and administration of DOT-assisted contracts, "create a level playing field on which DBEs can compete fairly for DOT-assisted contracts," "help remove barriers to the participation of DBEs in DOT-assisted contracts," and "assist the development of firms that can compete successfully in the marketplace outside the DBE program." 49 C.F.R. § 26.1.

Part 26 applies to recipients of certain federal USDOT funds. *See* 49 C.F.R. § 26.3. It provides that such recipients may certify firms as eligible to participate as DBEs. 49 C.F.R. §§ 26.61(a), 26.5.[7] Such certification provides firms with some advantages, in that the USDOT seeks to have not less than ten percent of authorized funds go to DBEs, and recipients of funds are to set an overall goal for DBE participation in USDOT-assisted contracts. *See* 49 C.F.R. §§ 26.41, 26.45(a)(1). A recipient of USDOT contracts must have a DBE program. 49 C.F.R. § 26.21. DBE status may prompt a contractor to hire a subcontractor regardless of non-union status. *See* 49 C.F.R. § pt. 26 app. A § IV.E.

Firms that are owned and controlled (at least fifty-one percent) by "socially and economically disadvantaged" individuals may apply for DBE certification, 49 C.F.R. §§

---

[7]Although not addressed by the parties, from the evidence and arguments in this case it appears undisputed that WisDOT (not the Wisconsin Unified Certification Program is a recipient of USDOT funds such that part 26 applies to it, and that the Wisconsin Unified Certification Program administers the DBE applications under part 26 for WisDOT.

26.67(d), 26.69(b), 26.73(e). Persons who are members of certain designated groups, including blacks, Hispanics, Native Americans, and women, are presumed to be socially and economically disadvantaged, though the presumption is rebuttable. § 26.61(c). Other individuals or firms seeking DBE certification bear the burden of demonstrating by a preponderance of the evidence that they are "socially and economically disadvantaged." § 26.61(d). The standards for determining social and economic disadvantage are described in Appendix E to part 26. § 26.61(d); 49 C.F.R. pt. 26 app. E, discussed in more detail below. If no presumption applies, the recipient determines DBE status on a case-by-case basis. 49 C.F.R. § 26.67(d).

Recipients of USDOT funds determine the eligibility of firms as DBEs. 49 C.F.R. § 26.83(b). To do so, they receive and review an appropriate application; perform an on-site visit to the firm's offices; analyze the ownership of an applicant that is a corporation; analyze the firm's bonding, financial capacity, and work history; obtain a statement from the firm regarding the type of work preferred; obtain or compile a list of the equipment owned by or available to the firm and the licenses the firm and key personnel possess. 49 C.F.R. § 26.83(c).

In the event a recipient denies a firm's request for DBE certification, the firm must be provided with "a written explanation of the reasons for the denial, specifically referencing the evidence in the record that supports each reason for the denial." 49 C.F.R. § 29.86(a). Afterward, the firm may appeal the denial to the USDOT, where it is directed to the Office of Civil Rights. 49 C.F.R. §§ 29.86(d), 29.89(a)(1), (a)(3). Following receipt of an appeal, USDOT requests a copy of the recipient's complete administrative record

pertaining to the DBE application; within twenty days of the request the recipient must provide the administrative record, including a hearing transcript.  49 C.F.R. § 26.89(d).

USDOT decides the appeal based solely on the administrative record. § 26.89(e).  It does not conduct a de novo review or hold a hearing, although it may allow supplementation of the record by the applicant firm.  § 26.89(e).

USDOT may reverse the recipient's denial of DBE certification only if it determines, based on the entire administrative record, that the denial was "unsupported by substantial evidence or inconsistent with the substantive or procedural provisions of [part 26] concerning certification."  § 26.89(f)(1), (f)(2).  A procedural error that did not result in fundamental unfairness or substantially prejudice the presentation of the case does not require reversal.  § 26.89(f)(3).  USDOT may remand the matter to the recipient if the record is incomplete or unclear on significant matters or if it instructs the recipient on proper application of part 26 in the case.  § 26.89(f)(4).

USDOT may not affirm based on grounds not specified in the recipient's decision.  § 26.89(f)(5).  However, under § 26.89(f)(1), the decision is affirmed unless USDOT "determines, based on the entire administrative record, that . . . [the] decision is unsupported by substantial evidence or inconsistent with the substantive or procedural provisions of this part."  These provisions have been read together to mean that the USDOT cannot go beyond the *grounds* set forth by the recipient, but USDOT is not limited to only the *facts* referenced by the recipient regarding those grounds; it may consider and reference the entire record.  *Grove Inc. v. U.S. Dep't of Transp.*, 578 F. Supp. 2d 37, 41 (D.D.C. 2008).

C.    Discussion

1.    Economic Disadvantage

Best Wood Judge is correct that USDOT's decision impermissibly extended beyond the grounds specified in WisDOT's decision, in violation of 49 C.F.R. § 26.89(f)(5).

As noted above, a firm must be owned by an individual who is socially and economically disadvantaged.    49 C.F.R. §§ 26.67(d), 26.69(b), 26.73(e).    WisDOT's decision was based only on social disadvantage.    (AR at 101 ("The Informal Hearing Committee finds that Mr. Holzrichter, a Caucasian male, is not socially disadvantaged as required by 49 CFR part 26."), 102 ("The IHC finds that the non-union status of Mr. Holzrichter's company does not meet the requirements for individual social disadvantage found in Appendix E of 49 CFR, part 26.").)    Indeed, Holzrichter was informed at his hearing that WisDOT was concerned only with the social disadvantage element of the pertinent test because the economic disadvantage element had already been "looked at" by WisDOT and was "pretty much a given."   (Nistler Aff. Ex. C at 12, 72.)

After determining on appeal that Holzrichter was not socially disadvantaged, USDOT discussed how Holzrichter did not meet the economic disadvantage criteria.  To the extent USDOT did so, its decision violated § 26.89(f)(5).  Thus, this court cannot rely on the economic disadvantage discussion in determining whether or not USDOT's decision should be upheld.  Nevertheless, reversal is not required if USDOT was correct when it upheld WisDOT on the social disadvantage element.

2.    Social Disadvantage

"Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities

21

as members of groups and without regard to their individual qualities. Social disadvantage must stem from circumstances beyond their control." 49 C.F.R. pt. 26 app. E. Evidence of individual social disadvantage must include:

> (A) At least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged;

> (B) Personal experiences of substantial and chronic social disadvantage in American society, not in other countries; and

> (C) Negative impact on entry into or advancement in the business world because of the disadvantage. Recipients will consider any relevant evidence in assessing this element. In every case, however, recipients will consider education, employment and business history, where applicable, to see if the totality of circumstances shows disadvantage in entering into or advancing in the business world.

49 C.F.R. pt. 26, app. E, Soc. Disadv. § I. The regulation requires that each of these elements be met by the applicant.

It is undisputed that Holzrichter is not a member of a presumptively socially disadvantaged group for purposes of 49 C.F.R. § 26.61(c), 26.67(a). Therefore, he bore the burden of establishing by a preponderance of the evidence that he met the criteria. *See* §§ 26.61(d), 26.67(d).

As noted above, WisDOT's denial referenced two grounds: (1) the non-union status of Best Wood Judge is not a personal or individual characteristic of Holzrichter or attributable to Holzrichter personally, and (2) the company's non-union status was not a circumstance beyond Best Wood Judge's control. The only evidence cited by WisDOT in

its denial letter was Holzrichter's admission at his hearing that the union had invited him to become a signatory but he refused. (AR at 102.)

In the case of a DBE denial, the recipient must provide specific references to evidence in the record. 49 C.F.R. § 29.86(a). However, a procedural error that did not result in fundamental unfairness or substantially prejudice the presentation of the case does not require reversal. § 26.89(f)(3). WisDOT minimally referenced evidence for its second basis for decision. For the first ground for denying DBE certification, provided that the USDOT's decision is acceptable, WisDOT's failure to cite specific evidence will not require reversal. The record is replete with evidence regarding Holzrichter's personal beliefs and his 100% ownership of a sole proprietorship. Assuming all of Holzrichter's personal beliefs are truly and sincerely held, WisDOT's decision was based on a distinction between Holzrichter and his business and a finding that Holzrichter's position was a choice within his control.

Likewise, the procedural error regarding WisDOT's failure to forward hundreds of pages of information and the recording or transcript of the WisDOT hearing to USDOT does not require reversal, as it did not result in fundamental unfairness or substantially prejudice the presentation of the case. *See* § 26.89(f)(3). After receiving the materials, USDOT considered them, then affirmed its prior decision. Moreover, the transcript from the WisDOT hearing hurts more than helps Best Wood Judge's case. For instance, the transcript reveals that Holzrichter stated to WisDOT that his issue is with Local 139 rather than unions generally and that his Catholic faith does not prohibit membership in unions.

WisDOT did not address the social disadvantage requirements on an element-by-element basis. Instead, it addressed the overall requirements that social disadvantage must be personal and individual and "stem from circumstances beyond their control." 49 C.F.R. pt. 26 app. E.

However, USDOT analyzed social disadvantage on an element-by-element basis. First, it found that

> Holzrichter did not meet the first element, which requires him to demonstrate that is [sic] "at least one objective feature that has contributed to social disadvantage, such as race, ethnic origin, gender, disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged." Mr. Holzrichter is a member of the Caucasian race, which the Regulation does not recognize as a presumptively disadvantaged group. This group is not one that the Regulation considers "isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged." Mr. Holzrichter does not allege any other distinguishing feature contributing to his social disadvantage, other than his status as a non-union employer. This is not a personal distinguishing feature nor is it a circumstance "beyond his control."

(AR at 3.) Next, as to the second element, USDOT wrote:

> Mr. Holzrichter is alleging that his "personal experiences of substantial and chronic social disadvantage" derives [sic] from his choice not to become a union employer. He further alleges that his non-union status has resulted in lost opportunities since union companies have "blacklisted" his firm. Although Mr. Holzrichter may consider joining the union to be against his personal beliefs, his experiences as a result of this choice are not the kind of personal experience as defined in the Regulation, which requires it to be "substantial and chronic." It is only in the business context wherein Mr. Holzrichter may experience a negative reaction to his being non-union. In any other context, this characteristic would not be known to others. While being a non-union member or employer may result in

24

> lost opportunities for Best Wood Judge, this would not be a
> "personal experience of substantial and chronic social
> disadvantage." In addition, his personal belief that unions are
> "immoral and unethical" explains why he chose not be a union
> employer. This does not rise to the level of a "religious belief"
> as you allege and WISDOT did not discriminate against Mr.
> Holzrichter in this regard.

(DPFMF ¶ 89; AR at 7.)

Next, the decision analyzed the third element of social disadvantage, negative impact or entry into or advancement in the business world: "Holzrichter is a certified arborist and has operated Best Wood Judge over 28 years, since 1980. . . . [T]he firm has a history of doing business and has obtained several large contracts. The record is void of supportive evidence of Mr. Holzrichter's difficulty entering into business, and he therefore, fails to meet this element of social disadvantage." (DPFMF ¶ 90; AR at 7.)

WisDOT's decision was based on the distinction between Best Wood Judge the company and Holzrichter personally and whether non-union status was within Holzrichter's and Best Wood Judge's control. These reasons impact the first two elements of the social disadvantage test and the overall requirement of "circumstances beyond their control." In discussing the third element of social disadvantage, negative impact or entry into or advancement in the business world, USDOT again went beyond WisDOT's decision. Therefore, this court will not uphold that basis for USDOT's decision.

As to the remaining elements, USDOT's decision is not arbitrary and capricious if it is supported by substantial evidence, § 706(2)(E), and, as noted above, the standard of review is very narrow.

Here, even though USDOT's decision may have been cavalier with respect to its treatment of Holzrichter's beliefs and interests it was not arbitrary and capricious.

25

First, USDOT's decision was based on consideration of the relevant factors, i.e., the required elements of the social disadvantage test in Appendix E. In addition, USDOT appears to have examined the relevant data and articulated a satisfactory explanation for its action.

USDOT's assessment of the personal, objective, distinguishing feature was slightly different than WisDOT's, yet related. WisDOT found that Best Wood Judge's non-union status was not a personal or individual characteristic of Holzrichter because of a distinction between Holzrichter and Best Wood Judge. USDOT found simply that status as a non-union employer was not a personal, objective, distinguishing feature of Holzrichter contributing to social disadvantage. It appears that USDOT accepted Best Wood Judge's argument that it and Holzrichter were one and the same based on the status of the business as a sole proprietorship. Nevertheless, Holzrichter and Best Wood Judge lost their appeal. With due regard for the record, this court cannot say that that conclusion was arbitrary and capricious.

One requirement of Appendix E is an objective feature other than race, ethnic origin, gender, disability, or exclusion from mainstream society, or other "similar causes not common to individuals who are not socially disadvantaged." One's membership in a union or willingness to sign a union contract as an employer does not equate with such characteristics.[8] Although the record supports Holzrichter's view his business is impacted

_____

[8]Best Wood Judge argues that the personal distinguishing feature contributing to Holzrichter's social disadvantage "is not the simple fact that he is a non-union employer. Rather, it is his deeply held religious beliefs that prevent him from joining a union." (Pl.'s Br. in Supp. Summ. J. at 13-14.) However, many people have the personal beliefs that Holzrichter says he has regarding honesty, refusal to coerce or use rough tactics, cooperation, refusal to use threats, etc. It is not those beliefs that would be an arguable personal distinguishing feature; it is how Holzrichter applies them to the possibility of membership in Local 139. Thus, the only arguable distinguishing feature is his non-Local 139 status.

by non-union status, considering the substantial WisDOT work that is given to union-bound general contractors, non-union status is not a personal, objective *social* disadvantage.[9]

As to the requirement that Holzrichter face personal experiences of substantial and chronic social disadvantage, USDOT was correct in observing that only in the business context does Holzrichter experience negative consequences for operating a non-union business. In other contexts, the "characteristic" would not be known to others. Best Wood Judge highlights this point: "Without union membership, [Holzrichter] is severely disadvantaged because *his opportunities for obtaining work are extremely limited*, thus placing him in a disadvantaged class of persons." (Pl.'s Br. Supp. Summ. J. at 14 (emphasis added).) But loss of a business opportunity does not cause a *personal* experience of substantial *social* disadvantage. Moreover, there is no evidence in the record of a "cultural bias" against non-union members or companies generally within American society. Holzrichter did not carry his burden of proof on this point.

Although WisDOT based its reasoning on a perceived distinction between Holzrichter and his business, the thought was proceeding down the right path. Any stigma or discrimination against the business and failure of the business to sign a union contract does not translate into a personal, social disadvantage of Holzrichter. The opposite is true as well: Holzrichter's personal refusal to join a union does not mean that his company

---

[9]In finding first that Caucasians are not considered "'isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged'" (AR at 3), USDOT missed the point. Holzrichter did not argue that he met DBE standards because he is white. He argued only non-union status (or his "religious" views on unions) as a basis for cultural bias causing social disadvantage.

Best Wood Judge argues that USDOT and WisDOT "take the approach that someone who is a white male is unable to obtain DBE status and entirely overlook that DBE status may be granted on the basis of 'cultural bias.'" (Pl.'s Br. in Supp. Summ. J. at 13.) However, WisDOT did not seem to take that approach, and USDOT, although missing the point at first, nevertheless addressed the correct matter eventually.

cannot sign a union contract. Holzrichter failed to establish how his refusal as a business owner to sign a union contract imparted on him a personal characteristic that gave rise to a social disadvantage or how his personal dislike for Local 139 caused disadvantage outside of the business context.

Further, USDOT, like WisDOT, identified that Best Wood Judge's non-union status was not a circumstance beyond Holzrichter's control, and this court agrees. Non-union status is not an immutable characteristic such as race, ethnicity, disability, or personal history that cannot be changed including imprisonment or residence in a mental health facility. Best Wood Judge's business form was Holzrichter's choice and is a matter within his control. Holzrichter was not barred from forming a corporation or signing a union contract. Moreover, USDOT was provided no evidence that if that occurred, Holzrichter had to join a union. The court is not aware of any requirement that the head of a corporation join a union to enable the corporation do union work and nothing on this point was offered by Holzrichter.

Holzrichter's anti-union beliefs are not universal, showing that non-union status is not a characteristic but rather a choice. Holzrichter believes teachers' unions and public-employee unions are "good" or "great." His distaste is for Local 139 and/or the IUOE only and it appears that his personal, anti-Local 139 sentiment is intense. But Holzrichter's views on Local 139 are a matter of choice and he has failed to establish that his criticisms of Local 139 are accurate. Newspaper articles of events involving members of another local union in New York, inflatable rats or comments by Local 139 members that he should join that union do not establish that Holzrichter's assumptions about Local 139 are true. Nor does a publication such as "Historical Catechism of American Unionism," published

by the Industrial Workers of the World, likely many years ago (based on its stated price of twenty-five cents).[10]  (Nistler Aff. Ex. B at 48.)

Moreover, Holzrichter's reference to economic reasons for not signing a union contract (that he would have to pay union rates to employees for all jobs, not just those relating to WisDOT work), highlights the choice-based nature of his anti-Local 139 statement.  As noted earlier, refusal to sign a union contract as an employer was a business decision for Best Wood Judge, as well as a reflection of Holzrichter's personal beliefs.

With regard to this point, Holzrichter cites to *Scott v. Commanding Officer*, which involved conscientious objection to military service.  431 F.2d 1132 (3d Cir. 1970), *overruled on other grounds*, *Ehlert v. United States*, 402 U.S. 99 (1971).  In *Scott*, a regulation regarding the reopening of a selective service classification required "a change in the registrant's status resulting from circumstances over which the registrant had no control."  *Id.* at 1135.  The Third Circuit aware of the problem of determining whether a change in beliefs resulting in purported conscientious objection would be due to circumstances beyond the registrant's control, stating that the question "is one upon which psychologists and philosophers might differ."  *Id.* at 1136.  The court remarked:  "By common definition, beliefs of conscience are always beyond one's control; one cannot sincerely turn his conscience on and off at will."  *Id.*

Here, the court does not find that Holzrichter's *beliefs* are circumstances within his control; instead, it finds that *how he applies them* in the context of union

---

[10]According to the website of the Industrial Workers of the World, the document or pamphlet was published in 1923.  IWW Reading Room and Library, http://www.iww.org/en/culture/library (last visited Mar. 19, 2011).

membership and how he perceives union membership (for instance, Local 139 versus other unions) are.

For these reasons, the court agrees with the USDOT that Holzrichter does not meet the elements of social disadvantage.

Holzrichter contends that denial of DBE status violates his right to free exercise of religion. A person may not be compelled to choose between his right to free exercise of religion and participation in an otherwise available public program. *Thomas v. Review Bd. of Ind. Emp't Div.*, 450 U.S. 707, 716 (1981). For instance, a state could not deny unemployment benefits to a member of the Seventh-day Adventist church who refused to work on Saturday when the employer went to a new work schedule. *Sherbert v. Verner*, 374 U.S. 398 (1963). However, "[o]nly beliefs rooted in religion are protected by the Free Exercise Clause." *Thomas*, 450 U.S. at 713.

"Courts should not undertake to dissect religious beliefs"; they "are not arbiters of scriptural interpretation." *Id.* at 715, 716. Religious beliefs may not be logical, acceptable, consistent or comprehensible to others. *Id.* at 714.

Nevertheless, there may be "an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause." *Id.* at 715. Generally, a reviewing court looks for an appropriate finding below that a person's action is based on "an honest conviction" that the action is forbidden by his religion. *See id.* at 716.

Here, by its finding that non-union status was Holzrichter's choice, WisDOT essentially found that Holzrichter's anti-Local 139 stance is not religious. USDOT affirmed that Holzrichter's personal belief that unions are immoral and unethical "does not rise to

the level of a 'religious belief'" as he alleged.  (AR at 7.)  This court cannot say that such a finding was arbitrary or capricious.

Even if review were less strict, the court would not be persuaded that Holzrichter's beliefs are religious.  "Religious" means "relating to that which is acknowledged as ultimate reality:  manifesting devotion to and reflecting the nature of the divine"; "that which one holds to be of ultimate importance"; "of or relating to religion"; or "committed, dedicated, or consecrated to the service of the divine."  Webster's Third New International Dictionary of the English Language Unabridged 1918 (1993).  Widely accepted definitions of "religion" include "the personal commitment to and serving of God or a god with worshipful devotion," "conduct in accord with divine commands," "one of the systems of faith and worship," or "a personal awareness or conviction of the existence of a supreme being . . . or influences controlling one's own, humanity's, or all nature's destiny."  *Id.*  While "religion" also means a cause or principle held with ardor and devotion or something inspiring zealous devotion, *id.*, the generally accepted understanding of the term relates to worship and faith in God or other divine being.

Title VII's definition of "religion" includes "all aspects of religious observance and practice, as well as belief," and 29 C.F.R. § 1605.1, relating to the Equal Employment Opportunity Commission, states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views," but that statute and that regulation do not apply in the present case, in which the applicable regulation does not even mention "religion" and the case invokes First Amendment free exercise concerns.  Moreover, Title VII does not mandate that an employer accommodate what amounts to a "purely personal preference."  *EEOC v. Union*

31

*Ind. de la Autoridad de Acueductors y Alcantarillados*, 279 F.3d 49, 56 (1st Cir. 2002) (internal quotation marks omitted).

Holzrichter contends that the defendants have not questioned the sincerity of his religious beliefs. However, a review of the proposed findings of fact and responses indicates that the defendants do not agree that his beliefs are religious in nature. (*See* PPFOF ¶¶ 19 (stating that Holzrichter testified that he held religious beliefs), 34 (discussing "beliefs concerning unionization"), 39 (discussing sincerity of "beliefs"), 57 (noting that USDOT decision did not question sincerity of "beliefs").)

Holzrichter admits that his Roman Catholic faith does not reject union membership. Moreover, Holzrichter is not opposed to all unions or the concept of union membership—and approves of teachers' and state workers' unions such as his wife's union—thereby reducing any inference that he holds an anti-union belief "religiously." Holzrichter is vehemently opposed to joining Local 139, and that objection may be based in his personal beliefs, ethics and morals. But in this court's opinion Holzrichter's opposition to Local 139 alone does not equate with his devotion to the divine, an ultimate being, or that which has ultimate importance. Holzrichter's opposition to Local 139 is neither required by a religious faith nor part of any personal religiousness; it is a personal preference based on personal principles. It is vastly unlike the "cardinal principle" of the Seventh-day Adventist faith regarding not working on Saturdays. *See Sherbert*, 374 U.S. at 406.

Declaring one's application of ethics and moral beliefs to a factual situation to be "religious" does not make it so. Any person could hold the opinions about unions that

Holzrichter holds about Local 139 without connecting them to a belief in God or some other spiritual source. Regardless,

Holzrichter was not compelled by the government to take actions against his religious beliefs.

The USDOT denial will be affirmed.

EQUAL PROTECTION[11]

In Count II of the Complaint, Best Wood Judge asserts that defendants "intentionally treat[ed] the appeal of its denial of DBE status differently from others similarly situated." He maintains that defendants did so by: (1) going beyond the grounds of WisDOT's decision, singling Best Wood Judge out for denial rather than acting as a neutral arbiter of the appeal; (2) refusing to acknowledge cultural bias based on religious beliefs while granting DBE status based on racial or ethnic prejudice; (3) scrutinizing Best Wood Judge's economic situation inconsistent with DBE regulations and the treatment of the economic situations of the applicants; (4) determining that he may disregard his religious beliefs and join what he believes to be an "immoral Union"; (5) determining that disadvantage in business is not disadvantage in society, especially in light of the "overwhelming number of instances of disadvantage" he provided, as opposed to what was provided by other candidates.

Best Wood Judge objects to defendants' motion for summary judgment on his equal protection claim because it believes this constitutional issue was bifurcated from the APA claim. However, it was not. During the scheduling conference of November 3,

---

[11]Equal protection constraints on the federal government are imposed through the due process clause of the Fifth Amendment. *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008).

2009, there was discussion of such a bifurcation. But in the end the court found that any discovery on the constitutional claim should be completed before summary judgment briefing (Sched. Conf. Tr. (Doc. 40) at 16), and that cross-motions for summary judgment could include the constitutional issue (*id.* at 17). Both counsel recognized this before the end of the scheduling conference. (*Id.* at 16 (Attorney Nistler answering "Okay" after the court stated that discovery on the constitutional issue should take place prior to briefing), (*id.* at 17 (Attorney Guadanigno stating "since depositions and some discovery may be in place, a motion will be addressing both issues, could we . . . maybe back up the summary judgment to the end of February instead of January"). Expert discovery related to damages on the constitutional claim was suspended (*id.* at 17), but not consideration of the substance of the constitutional claim. Moreover, plaintiff could have requested time to conduct discovery on the constitutional claim if he believed discovery was necessary. Fed. R. Civ. P. 56(d)(2). Therefore, the court is considering defendants' summary judgment motion to dismiss the plaintiff's equal protection claim.

In its response/reply brief, Best Wood Judge indicates that it is not challenging the DBE program but rather the application of the certification process to Best Wood Judge. (Pl.'s Resp. to Defs.' Combined Mot. & Br. (Doc. 42) at 23.) Thus, Best Wood Judge does not contend that it (or Holzrichter) is a member of a protected group that defendants discriminated against. As the brief confirms, this is a case where the equal protection claim is on behalf of a "class of one." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). A class-of-one challenge asserts that an individual person or entity has been irrationally singled out

34

for discriminatory treatment, without regard for any group affiliation. *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008).

To establish such discrimination a plaintiff must show that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Moore*, 543 F.3d at 896 (internal quotation marks omitted); *Albiero*, 246 F.3d at 932 (internal quotation marks omitted). To be "similarly situated," the class-of-one challenger and those to whom he compares himself must be "prima facie identical in all relevant respects or directly comparable . . . in all material respects." *Moore*, 543 F.3d at 896 (emphasis omitted) (alteration in original).

Some of Holzrichter's purported bases for the equal protection claim are merely continuations of the argument that USDOT's decision should be reversed under the APA. These contentions fail for reasons discussed above. For instance, Holzrichter can choose to disregard his religious beliefs and that disadvantage in business is not disadvantage in society and has failed to demonstrate that he or Best Wood Judge belong to a protected, disadvantaged class.

Nevertheless, it's contended that Holzrichter was treated differently from two groups or persons: (1) those granted DBE status on the basis of racial or ethnic prejudice, and (2) Nietzer, who was the only Caucasian male ever granted DBE status by WisDOT. (Pl.'s Resp. to Defs.' Combined Mot. & Br. (Doc. 42) at 23.)

Comparison of Holzrichter and Best Wood Judge to the first group fails because there is a rational reason for different treatment, generally entities that are granted DBE status based on race or ethnic bias are presumed to be socially disadvantaged, whereas Best Wood Judge bore the burden to establish such disadvantage. Moreover,

for the reasons set forth above regarding the APA claim, USDOT was justified in rejecting Best Wood Judge's DBE application.

Best Wood Judge further contends that in the history of WisDOT's DBE program, cultural bias has never been a basis for certification. But that does not translate into a rational jury concluding that Best Wood Judge was denied certification merely because it applied for DBE certification under the cultural bias language.

Turning to Holzrichter's contention that he and Best Wood Judge were treated differently than Nietzer, the court notes that he like Holzrichter, was a landscaper, a Caucasian, and a sole proprietor. However, Nietzer's leg was amputated and he could not afford a prosthesis. A man missing a leg was not similarly situated to Holzrichter, who failed to produce any evidence that he has physical limitations. The definition of "socially disadvantaged" references "disability," which a man without a leg or prosthesis would have. And even though Holzrichter may have provided WisDOT with more factual support for his application than Nietzer, that would not tip matters here in his favor. It is whether Nietzer and Holzrichter, the two individuals, are similarly situated for purposes of DBE applications. Nietzer's status as an amputee does not equate with Holzrichter's selective anti-union views; thus, the two men were not similarly situated for purposes of their applications.

Finally, Holzrichter contends that he was singled out for disparate treatment as evidenced by the failure of WisDOT to include in the record sent to USDOT hundreds of pages and his hearing transcript. However, he provides no legal authority for holding USDOT legally accountable under an equal protection theory for the actions of WisDOT. Moreover, the missing documents were in the end considered by USDOT and no harm

occurred.  Lastly, nothing in this record supports a finding of vindictiveness or animus by the USDOT against Holzrichter or Best Wood Judge.

CONCLUSION

For the above-stated reasons,

IT IS ORDERED that Best Wood Judge's motion for summary judgment (Doc. 26) is denied, defendants' motion for summary judgment (Doc. 32) is granted, and this case is dismissed.

Dated at Milwaukee, Wisconsin, this 25th day of March, 2011.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE